FILED

OCT 27, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.                                          CRIMINAL NO. 3:21-cr-108

CAREY "CRAIG" WILLIAMS, D.P.M.              18 U.S.C. § 1349
                                            18 U.S.C. § 1347
                                            18 U.S.C. § 371
                                            18 U.S.C. § 2
                                            42 U.S.C. § 1320a-7b(b)

**The Grand Jury Charges:**

At all times relevant to this Indictment:

## GENERAL ALLEGATIONS

### Defendant and Introduction

1.     **CAREY "CRAIG" WILLIAMS, D.P.M. ("WILLIAMS")**, of Yalobusha County, Mississippi, was a doctor of podiatric medicine licensed in the State of Mississippi who had the ability to prescribe medications and order diagnostic testing.

2.     **WILLIAMS** owned, operated, and managed a podiatry clinic located in the Northern District of Mississippi with an in-house pharmacy, through which **WILLIAMS** prescribed foot bath medications and ordered molecular diagnostic testing for individuals throughout the State of Mississippi.

3.     As detailed herein, between approximately July 2016 and July 2021, **WILLIAMS** conspired to and engaged in a scheme to defraud the United States and health care benefit programs, including the Medicare program ("Medicare"), of more than $11.3 million. To that end, **WILLIAMS** and his co-conspirators fraudulently formulated, prescribed, dispensed, and billed insurance companies for, including Medicare and its sponsors, foot bath medications produced and

dispensed to individuals, which circumvented federal regulations and approvals regarding use and efficacy and which exploited the manner in which health insurance companies reimbursed the dispensation of medications. In addition, **WILLIAMS** and his co-conspirators targeted and solicited individuals to provide biological specimens, such as toenails, and performed, and caused to be performed, medically unnecessary molecular diagnostic testing. Specifically, **WILLIAMS** and his co-conspirators sold signed doctors' orders along with individuals' biological specimens to a diagnostic laboratory, whereupon the laboratory performed medically unnecessary molecular diagnostic testing on the specimens and submitted false and fraudulent claims to Medicare and Medicare Advantage plans. In exchange for his participation in the scheme to defraud the United States and health care benefit programs, **WILLIAMS** conspired to and solicited and received kickbacks and bribes from a purported marketer acting on behalf of various pharmacies and diagnostic laboratories.

4. Between approximately July 2016 and July 2021, **WILLIAMS** and his co-conspirators caused pharmacies with which they had financial relationships to submit false and fraudulent claims for medically unnecessary foot bath medications to health care benefit programs, including Medicare, via its sponsors, and Aetna, through interstate wire transmissions, in the amount of at least $4.9 million and were reimbursed approximately $4.9 million. Between approximately January 2018 and April 2021, **WILLIAMS** and his co-conspirators caused the relevant diagnostic laboratory to submit more than $6.4 million in false and fraudulent claims to health care benefit programs, including Medicare, through interstate wire transmissions, for medically unnecessary molecular diagnostic testing and was reimbursed more than $2.1 million.

2

**Health Care Benefit Programs and Claims Submission Process**

5.      Medicare was a federally funded health insurance program that provided health care benefits to individuals who were 65 years of age or older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS").

6.      Private insurance companies, such as Aetna, provided health care benefits for individuals enrolled with their plans (collectively, the "various private plans").

7.      Medicare and the various private plans were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b), and Medicare was a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

8.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

9.      Individuals who qualified for benefits under the various private plans, including Aetna, were referred to as "members."

10.     Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part A covered hospital inpatient care; Medicare Part B covered physicians' services and outpatient care; Medicare Part C covered Medicare Advantage Plans; and Medicare Part D covered prescription drugs.

11.     Physicians, clinics, and other health care providers, including pharmacies and laboratories (collectively, "providers"), that provided services to beneficiaries and members, could enroll with health care benefit programs, including Medicare and the various private plans, and provide medical services to beneficiaries and members. Providers were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file

claims with Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

12.     When seeking reimbursement from Medicare or the various private plans for provided benefits, items, or services, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual.  Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number; (b) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier.  Claims seeking reimbursement from Medicare or the various private plans could be submitted in hard copy or electronically.

**Medicare Part B**

13.     Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for benefits, items, and services rendered to beneficiaries.

14.     Novitas Solutions, Inc. ("Novitas") was the MAC for consolidated Medicare jurisdictions JH and JL, which included Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania. Regardless of where services were provided within jurisdictions JH and JL, Novitas received and adjudicated claims in, and paid claims from, Cumberland County, Pennsylvania. Claims submitted electronically from providers in Mississippi to Novitas necessarily traveled in interstate commerce to be adjudicated.

4

15.     Palmetto GBA, LLC ("Palmetto") was the MAC for consolidated Medicare jurisdictions JJ and JM, which included Alabama, Georgia, Tennessee, North Carolina, South Carolina, Virginia, and West Virginia.   Regardless of where services were provided within jurisdictions JJ and JM, Palmetto received and adjudicated claims in, and paid claims from, Richland County, South Carolina.  Claims submitted electronically from providers in Virginia to Palmetto necessarily traveled in interstate commerce to be adjudicated.

16.     To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement.  The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider.  CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this supplier.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

17.     In executing CMS Form 855B, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

18.     Payments under Medicare Part B were often made directly to the providers rather than to the patient or beneficiaries.  For this to occur, beneficiaries would assign the right of payment to providers.  Once such an assignment took place, providers would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

**Medicare Advantage Program**

19.     The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans ("Medicare Advantage Plans"), rather than through Medicare Parts A and B.

20.     Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same services and supplies offered under Medicare Part A and Part B.  To be eligible to enroll in a Medicare Advantage Plan, an individual had to have been entitled to receive benefits under Medicare Part A and Part B.

21.     A number of private health insurance companies, along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to beneficiaries through various Medicare Advantage Plans.  These health insurance companies, through their respective Medicare Advantage Plans, adjudicated claims in locations throughout the United States, specifically outside the States of Mississippi and Virginia, and often made payments directly to providers, rather than to the beneficiaries who received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

22.     To obtain payment for services or treatment provided to beneficiaries enrolled in Medicare Advantage Plans, providers were required to submit itemized claim forms to the beneficiary's Medicare Advantage Plan.  The claim forms were typically submitted electronically via the internet.  The claim form required certain important information, including the information provided in Paragraph 12 of the Indictment.

23.     When providers submitted claim forms to Medicare Advantage Plans, the providers certified that the contents of the forms were true, correct, complete, and that the forms were

6

prepared in compliance with the laws and regulations governing Medicare. Providers also certified that the services being billed were medically necessary and were in fact provided as billed.

24.     The private health insurance companies offering Medicare Advantage Plans were paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services the beneficiary received. These payments by Medicare to the health insurance companies were known as "capitation" payments. Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a Medicare Advantage Plan, regardless of whether the beneficiary utilized the plan's services that month. CMS determined the per-beneficiary capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence. CMS adjusted the capitation rates annually, taking into account each beneficiary's previous complaints, diagnoses, and treatments. Beneficiaries with more illnesses or more serious conditions would rate a higher capitation payment than healthier beneficiaries.

**Medicare Part D and Private Insurance Pharmacy Benefits**

25.     In order to receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare Part D drug plans were operated by private health care insurance companies approved by Medicare and referred to as drug plan "sponsors." Humana Insurance Company ("Humana") and Wellcare Prescription Insurance, Inc. ("Wellcare") were Medicare sponsors. A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

26.     CMS compensated the Medicare sponsors for providing prescription drug benefits to beneficiaries. CMS paid Medicare sponsors a monthly capitation fee for each beneficiary enrolled in the Medicare sponsors' plans. In addition, in some cases where a Medicare sponsor's

7

expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, CMS reimbursed the Medicare sponsor for a portion of those additional expenses.

27. Conversely, private plans, such as Aetna, provided direct prescription drug coverage to eligible members through their pharmacy programs or similar drug plans.

28. Typically, Medicare and private plans, such as Aetna, did not process their insureds' prescription claims directly. Instead, Medicare's drug plans and private plans were administered by Pharmacy Benefit Managers ("PBMs"), whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies. PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

29. A pharmacy could participate in the Part D program by entering into a provider agreement with a Part D drug plan or with a PBM. For example, Humana had its own in-house PBM whereas CVS Caremark was the PBM for Wellcare and Aetna. Pharmacies entered into contractual agreements with PBMs either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers. By contracting with drug plans or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

30. Upon receiving prescriptions, pharmacies submitted claims to Medicare, to private plans, or to PBMs for dispensing prescription drugs. Medicare, private plans, and PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries and members.

31.     Electronic claims submitted to Part D drug plans, private plans, or PBMs by pharmacies located in Mississippi or Louisiana necessarily traveled via interstate wire to be adjudicated.  For example, regardless of the location of the pharmacies that provided pharmacy benefits, Humana adjudicated claims submitted electronically in Jefferson County, Kentucky and CVS Caremark adjudicated claims submitted electronically in Maricopa County, Arizona.

32.     Under the Social Security Act, Medicare covered Part D drugs that were dispensed upon a valid prescription and for a "medically accepted indication."  42 U.S.C. § 1395w-102(e).  Medicare generally did not cover drugs meant for prevention of disease and only covered drugs meant to treat an existing illness or injury.

33.     Similarly, for prescription drugs to be reimbursed, private plans required that prescription drugs be dispensed pursuant to valid prescriptions and be medically necessary for the treatment of covered illnesses or conditions.  In other words, health care benefit programs would not reimburse claims for prescription drugs that were not medically necessary or dispensed without a valid prescription.

34.     To prevent fraud, waste, and abuse, Medicare, private plans, and PBMs required providers, including pharmacies, to collect copayments from beneficiaries and members prior to or soon after the service or item was provided and specified that copayments could not be systematically waived or reduced.  Consistent copayment collection was a fraud prevention measure, as copayments gave beneficiaries and members financial incentives to reject medications that were not medically necessary or had little or no value to beneficiaries' and members' treatments.

**Foot Bath Medications**

35.     To be reimbursed for prescription medications, pharmacies submitted claims to

9

insurance companies identifying each drug or drug ingredient dispensed, including each drug's National Drug Code ("NDC") number, and were reimbursed accordingly.

36.     Health care benefit programs or PBMs typically reimbursed pharmacies the Average Wholesale Price ("AWP") of each drug ingredient dispensed, minus any negotiated discount. AWP referred to the average price at which drugs or drug ingredients were sold at the wholesale level. Drugs or drug ingredients with NDC numbers that reimbursed at high rates were called "high-adjudication."

37.     Podiatrists sometimes prescribed high-adjudication antibiotic and antifungal drugs ("high-adjudication foot bath medications") along with a plastic foot tub and instructed the beneficiary or member to compound the drugs themselves at home by mixing the medications with warm water in order to soak their feet.

38.     These high-adjudication foot bath medications were prescribed, purportedly, to treat a variety of fungal, bacterial, or other types of foot infections, and routinely included vancomycin 250 milligram capsules, calcipotriene 0.005% cream, clindamycin phosphate 1% solution, ketoconazole 2% cream, and other expensive drugs.   Typically, the drugs selected for use in foot baths did not require pre-authorization from Medicare prior to prescribing them to a beneficiary. Additionally, the majority of these drugs were not subject to utilization management, meaning that there was no limit on the quantity of drugs that could be ordered in a single prescription.

39.     In late 2019, Medicare, private insurers, and others issued alerts regarding this foot bath scheme. On November 20, 2019, CMS issued an Alert on "Foot Baths and Soaks." The Alert, which was sent to the Medicare Part D plans, stated that CMS "has been made aware of questionable prescribing and dispensing of multiple drugs (typically antibiotics and antifungal

10

medications) that are being used in a foot bath. Beneficiaries are provided a foot spa free of charge, with instructions from the pharmacy to mix the medications with water in order to soak their feet." According to CMS, "[t]hese high-reimbursable medications . . . are often dispensed without medical necessity or pursuant to true medical relationships. In addition, they may be of limited clinical value and may be harmful to patients, if used as dispensed." The drugs "are typically provided monthly and are of limited clinical effectiveness in the manner they are being utilized by the beneficiaries. Drugs such as oral capsules, ointments, and injections may be dispensed to beneficiaries to combine in the footbath. These drugs may have limited ability to work topically in a footbath as prescribed and dispensed."

40.     Further, "[p]otential patient harm is a significant concern for these unapproved treatments. Topical soaks are not the standard of care in treatment of foot infections . . . and could be actively harmful to the healing process." "In addition, harm can occur through patients being confused regarding atypical directions for drug products which conflicts with typical drug information." For example, "a beneficiary may mistakenly ingest vancomycin capsules orally . . . because this is the usual route of administration," but such could cause "symptoms such as abdominal pain, nausea, and diarrhea by overgrowth of abnormal bacteria." An "additional example is the development of systemic vancomycin resistance in a beneficiary through topical absorption in open wounds who may later need vancomycin for system intravenous (IV) use for a life threatening infection."

41.     In sum, "[t]he purported indications for use of these combinations used in this manner, may not be medically accepted indications (MAIs) and are, at best, investigative and experimental treatments."

11

42.     Following the issuance of the CMS Alert and other alerts, health care benefit programs began limiting coverage of high-adjudication foot bath medications and auditing providers who were identified as high-volume prescribers of such medications.  In response, in mid-2020, pharmacies and other providers largely ceased dispensing foot spas and began dispensing high-adjudication foot bath medications with different routes of administration besides a foot spa, including combining the high-adjudication foot bath medications with solution into a spray bottle to be sprayed on beneficiaries' and members' feet or mixing the high-adjudication foot bath medications into a wash pan so that beneficiaries and members could soak their feet without the agitator provided by the foot spa.

### Molecular Diagnostic Testing

43.     Molecular diagnostic tests were laboratory tests that used polymerase chain reaction testing and metagenomics to extract DNA from fungi to determine whether different types of bacteria were present in the specimen provided.

44.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 13957(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

45.     To conduct molecular diagnostic testing, a laboratory had to obtain a biological specimen from the patient.  One way to obtain a biological specimen was to extract nail clippings from a patient, and another way was to take a culture of a patient's wound.  The biological specimen was then submitted to the diagnostic laboratory to conduct testing.

46. Biological specimens were submitted along with requisitions, or doctors' orders, that identified the patient, the patient's insurance, and indicated the specific tests to be performed. In order for laboratories to submit claims to Medicare for molecular diagnostic tests, the requisitions had to be signed by a physician or other authorized medical professional, who attested to the medical necessity of the test.

### Relevant Entities

47. North Mississippi Foot Specialists, P.C. ("NMFS"), formed in 2002 and located in Lafayette County, Mississippi, was a medical clinic that provided, among other services, podiatry treatment to beneficiaries and members. In July 2016, NMFS opened a community pharmacy by the same name within the medical clinic that later was renamed and formed as Oxford Premier Pharmacy, LLC. **WILLIAMS** owned and operated NMFS and contracted with Medicare, Medicare sponsors, and various private plans to provide health care items and services to beneficiaries and members.

48. Oxford Premier Pharmacy, LLC ("Oxford Premier Pharmacy"), formed in 2019 and located Lafayette County, Mississippi, was a community pharmacy also owned by **WILLIAMS** and located within NMFS.

49. Pharmacy 1, formed in 2017 and located in East Baton Rouge Parish and Jefferson Parish, Louisiana, was an open-door retail and mail-order pharmacy that specialized in the production and dispensation of high-adjudication foot bath medications and other high-adjudication medications.

50. Laboratory 1, formed in 2017 and located in Henrico County, Virginia, was an independent diagnostic laboratory.

## Relevant Individuals

51.     Logan Hunter Power ("Power"), of Lafayette County, Mississippi, solicited and recruited practitioners to write prescriptions for high-adjudication foot bath medications and other high-adjudication medications to be referred to various pharmacies and recruited practitioners to submit doctors' orders and biological specimens to various diagnostic laboratories, through his company, Power Medical, LLC.

52.     Co-conspirator 1, of Lafayette County, Mississippi, was a podiatrist licensed to practice in the State of Mississippi who had the ability to prescribe medications and order molecular diagnostic testing, and who worked at NMFS.

53.     Podiatrist 1, of DeSoto County, Mississippi, was a podiatrist licensed to practice in the State of Mississippi who had the ability to prescribe medications and order molecular diagnostic testing.

## THE FRAUDULENT SCHEME

### Overview

54.     **WILLIAMS** and his co-conspirators engaged in a scheme and artifice to defraud the United States, through Medicare, its sponsors, and the various private plans by (a) soliciting and receiving kickbacks and bribes in exchange for ordering and arranging for the ordering of high-adjudication foot bath and other medications to be dispensed to beneficiaries and members by Pharmacy 1 and other pharmacies; (b) prescribing medically unnecessary high-adjudication foot bath medications and other medications to beneficiaries and members; (c) soliciting and receiving kickbacks and bribes in exchange for ordering and arranging for the ordering of molecular diagnostic testing to be completed by Laboratory 1 and other laboratories; (d) ordering medically unnecessary molecular diagnostic testing to be performed on biological specimens of

14

beneficiaries and members; (e) causing the submission of false and fraudulent claims to Medicare, its sponsors, and the various private plans; (f) concealing and causing the concealment of false and fraudulent claims to Medicare, its sponsors, and the various private plans; and (g) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

<strong>Purpose of the Scheme and Artifice</strong>

55.     It was a purpose of the scheme and artifice for **WILLIAMS** and his co-conspirators to unlawfully enrich themselves.

<strong>Manner and Means of the Scheme and Artifice</strong>

56.     The manner and means by which **WILLIAMS** and his co-conspirators sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

Foot Bath Medications

a.     In or around July 2016, after learning of the high reimbursements paid to pharmacies by health care benefit programs for the dispensation of foot bath medications, **WILLIAMS** opened a pharmacy within NMFS that later was organized as Oxford Premier Pharmacy, which specialized in the dispensation of high-adjudication foot bath medications.

b.     To maximize reimbursements from Medicare and its sponsors and the various private plans, NMFS and Oxford Premier Pharmacy dispensed high-adjudication medications in large quantities to be dissolved in foot baths to beneficiaries and members, not based on evaluations of effectiveness or individualized patient need, but rather, based on foot bath medications being high-adjudication.

c.     Power was a medical sales representative who also made money by soliciting practitioners to send prescriptions, doctors' orders, and biological specimens to Pharmacy 1, Laboratory 1, and other health care providers. Power was not a bona fide employee

15

of these entities, but rather, received a percentage of the reimbursements paid to these entities by Medicare and the various private plans for referring prescriptions to pharmacies and doctors' orders and biological specimens to laboratories.

        d.      Power sought out and formed relationships with pharmacies that dispensed high-adjudication foot bath medications and solicited **WILLIAMS** and Co-conspirator 1 to refer prescriptions for high-adjudication foot bath medications to those pharmacies with which Power had relationships.

        e.      In or around January 2019, Power entered into a purported employment agreement with Pharmacy 1 whereby Power would refer prescriptions for high-adjudication foot bath medications to be filled by Pharmacy 1 in exchange for thirty percent of the reimbursements received by Pharmacy 1 for those prescriptions, including prescriptions for beneficiaries.

        f.      Pharmacy 1 created a series of preprinted, check-the-box prescription forms listing combinations of high-adjudication foot bath medications in order to encourage and direct practitioners to prescribe these specific high-adjudication combinations to beneficiaries and members, instructing beneficiaries and members to combine the medications themselves at home by mixing the medications into warm water in a foot bath provided by Pharmacy 1 and soaking their feet.

        g.      **WILLIAMS** agreed with Power and Co-conspirator 1 to prescribe high-adjudication foot bath medications to beneficiaries and members utilizing Pharmacy 1's preprinted prescription forms in exchange for a percentage of the reimbursements paid to Pharmacy 1 by Medicare and other health care benefit programs for dispensing high-adjudication foot bath medications to beneficiaries and members.

h.  **WILLIAMS** and Co-conspirator 1 also prescribed high-adjudication foot bath medications to, and authorized refills for, beneficiaries and members who were patients of NMFS, and for beneficiaries and members regardless of whether the high-adjudication foot bath medications were medically necessary for the treatment of the individual patients.

i.  For example, **WILLIAMS** authorized prescriptions for high-adjudication foot bath medications to beneficiaries and members living in nursing and group homes irrespective of whether the high-adjudication foot bath medications were medically necessary.  At least one group home complained that patients who could not effectively communicate received large quantities of high-adjudication foot bath medications from **WILLIAMS**, which medications expired before patients could utilize them all.

j.  **WILLIAMS** routinely prescribed high-adjudication foot bath medications in contravention of the medically intended and accepted use of such medications.  For example, vancomycin was an antibiotic intended to be taken orally for the treatment of a specific bacterial infection of the colon.  **WILLIAMS** regularly prescribed vancomycin 250 milligram capsules in quantities of 360 capsules per prescription to patients who did not have a bacterial infection.

k.  Likewise, ketoconazole was an antifungal cream indicated to be applied topically for the treatment of athlete's foot and other fungal infections.  **WILLIAMS** frequently prescribed ketoconazole cream and directed beneficiaries and members to squeeze half a tube into a foot bath and soak twice daily, despite ketoconazole not being water soluble.

l.  In mid-2020, when health care benefit programs began limiting coverage of foot bath medications, **WILLIAMS** and Co-conspirator 1 began prescribing similar medications to be mixed by beneficiaries and members at home into water or solution and used in foot sprays or wash pans by beneficiaries and members, despite there being no medically accepted indication

17

for mixing medications with water or solution and spraying them on one's feet or immersing one's feet in them.

m.      Despite knowing that remuneration could not be paid or received for referring prescriptions to Pharmacy 1 for beneficiaries, **WILLIAMS** and Co-conspirator 1 solicited and received remuneration, namely kickbacks and bribes, from Power in exchange for his referring prescriptions ordering the dispensing of high-adjudication foot bath medications to beneficiaries.

n.      Notwithstanding that beneficiaries and members had the ultimate choice in providers, including pharmacies, due to the kickbacks paid by Pharmacy 1 to practitioners and marketers, beneficiaries and members were denied the ability to choose which pharmacy, if any, they desired to actually fill their prescriptions.

o.      With knowledge of Oxford Premier Pharmacy and Pharmacy 1's obligations with Medicare, its sponsors, and PBMs, to collect full copayments, at the direction of **WILLIAMS** and/or with his knowledge, Oxford Premier Pharmacy and Pharmacy 1 routinely waived or reduced copayments of beneficiaries and members and advertised to beneficiaries and members that they would have no out-of-pocket expenses.

p.      Upon receiving prescriptions authorized by **WILLIAMS** and Co-conspirator 1, Oxford Premier Pharmacy and Pharmacy 1 submitted electronic claims through interstate wire transmissions to Medicare, its sponsors, and the various private plans, through their respective PBMs, seeking reimbursement for the high-adjudication foot bath medications prescribed.

18

q.      Oxford Premier Pharmacy and Pharmacy 1 then dispensed, typically by mailing, high-adjudication foot bath medications to beneficiaries and members predicated upon prescriptions authorized by **WILLIAMS** and Co-conspirator 1.

r.      Medicare and the various private plans reimbursed Oxford Premier Pharmacy and Pharmacy 1's claims for dispensing high-adjudication foot bath medications, relying upon Oxford Premier Pharmacy's, Pharmacy 1's, and **WILLIAMS'** and Co-conspirator 1's representations that the high-adjudication foot bath medications were dispensed based upon valid prescriptions and were medically necessary.

s.      From in or around July 2016 through December 2020, Medicare reimbursed Oxford Premier Pharmacy approximately $4,096,487.37 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **WILLIAMS**.

t.      From in or around February 2019 through July 2021, Medicare reimbursed Pharmacy 1 approximately $816,756.15 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **WILLIAMS**.

57.      Additional manner and means by which **WILLIAMS** and his co-conspirators sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

<u>Molecular Diagnostic Testing</u>

a.      In addition to his relationships with pharmacies, Power sought out and formed relationships with diagnostic laboratories whereby the laboratories would pay him a percentage of the reimbursements received for testing of biological specimens referred by Power.

b.      In or around January 2018, Power entered into an agreement with Laboratory 1 whereby Power would receive twenty-five percent of the reimbursements received

19

by Laboratory 1 after billing health care benefit programs, including Medicare, for conducting molecular diagnostic testing referred by Power.

        c.        Power approached **WILLIAMS** to determine whether **WILLIAMS** had an interest in partnering with him to send doctors' orders and biological specimens to Laboratory 1 in exchange for a share of the reimbursements that Power received from his referrals.

        d.        **WILLIAMS** agreed to send doctors' orders and biological specimens to Laboratory 1 in exchange for a share of the reimbursements received by Laboratory 1 for molecular diagnostic testing performed on the biological specimens.

        e.        **WILLIAMS** took toenail clippings and wound cultures from beneficiaries and members and directed his staff to send the toenail clippings and wound cultures to Laboratory 1, regardless of whether the molecular diagnostic testing of toenail clippings and wound cultures was medically necessary for the treatment of the individual patients.

        f.        Specifically, **WILLIAMS** and/or NMFS had arrangements with several nursing and group homes, where **WILLIAMS** obtained biological specimens from large numbers of beneficiaries and members regardless of whether the individuals needed molecular diagnostic testing, sometimes obtaining over thirty biological specimens per nursing home and/or group home.

        g.        **WILLIAMS** typically requested a barrage of molecular diagnostic testing on the biological specimens, including testing for highly unusual organisms such as Mycobacterium and *Bartonella henselae*, the bacteria that causes "cat scratch disease."

        h.        At times, **WILLIAMS** requested molecular diagnostic testing for bacterial infections in patients that presented with fungal nail infections rather than with bacterial infections, rendering such tests medically unnecessary.

      i.     **WILLIAMS** acknowledged the lack of medical necessity for the orders for molecular diagnostic testing of toenails when he stated to Podiatrist 1, "I do a different nail every time they come in for nail care."

      j.     Despite knowing that remuneration could not be paid or received for referring biological specimens to Laboratory 1 for beneficiaries, nevertheless, **WILLIAMS** solicited and received remuneration, namely kickbacks and bribes, from Power in exchange for his referring biological specimens of beneficiaries to Laboratory 1.

      k.     Although Laboratory 1 was required to collect full copayments from beneficiaries and members, Laboratory 1 did not make genuine efforts to collect copayments from beneficiaries and members.

      l.     Laboratory 1 subsequently submitted electronic claims through interstate wire transmissions to Medicare, Medicare Advantage Plans, and the various private plans, seeking reimbursement for the molecular diagnostic testing performed.

      m.     From in or around January 2018 through April 2021, Laboratory 1 submitted approximately $6,489,631 in false and fraudulent claims to Medicare and Medicare Advantage Plans and was reimbursed approximately $2,196,419 for false and fraudulent claims submitted for molecular diagnostic testing of biological specimens submitted by or on behalf of **WILLIAMS**.

## COUNT 1

### The Conspiracy and Its Objects

58.     Paragraphs 1 through 57 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

59.     Beginning in or around July 2016, and continuing through in or around July 2021, in Lafayette County, in the Northern District of Mississippi, and elsewhere, the defendant,

**CAREY "CRAIG" WILLIAMS, D.P.M.,**

did knowingly and willfully, that is with the intent to further the objects of the conspiracy, conspire and agree with Power, Co-conspirator 1, and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.      to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, its sponsors, and the various private plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of Medicare, its sponsors, and the various private plans, in connection with the delivery of and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347; and

b.      to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

60.     It was a purpose of the conspiracy for **WILLIAMS** and his co-conspirators to unlawfully enrich themselves, as described in Paragraphs 54 and 55 of this Indictment, which are re-alleged and incorporated by reference as though fully set forth herein.

### Manner and Means of the Conspiracy

61.     In furtherance of the conspiracy and to accomplish its objects and purpose, the methods, manner, and means that were used are described in Paragraphs 54 through 57 of this Indictment and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2-8

### The Scheme and Its Execution

62.     Paragraphs 1 through 57 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

63.     Beginning in or around July 2016, and continuing through in or around September 2021, in Lafayette County, in the Northern District of Mississippi, and elsewhere, the defendant,

### CAREY "CRAIG" WILLIAMS, D.P.M.,

aiding and abetting and aided and abetted by Power, Co-conspirator 1, and others known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute and attempt to execute, a scheme or artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, its sponsors, and the various private plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises,

money owned by, and under the custody and control of, Medicare, its sponsors, and the various private plans.

64.     The scheme to defraud is more fully described in Paragraphs 56 and 57 of this Indictment and is re-alleged and incorporated by reference as if fully set forth herein.

65.     On or about the dates specified below, in the Northern District of Mississippi, and elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **WILLIAMS** submitted or caused to be submitted the following false and fraudulent claims to Medicare, its sponsors, and the various private plans for high-adjudication foot bath medications that were not medically necessary and not eligible for reimbursement, in an attempt to execute and in execution of the scheme, as described in Paragraph 56 of this Indictment, with each execution set forth below forming a separate count:

| Count | Beneficiary/ Member | Program/ Sponsor/ Plan | Prescription Claim Number | Drug Dispensed | Approx. Date of Claim Submission | Approx. Amount Received |
|---|---|---|---|---|---|---|
| 2 | B.G. | Aetna | Pharmacy 1 Prescription Number 202431 | Vancomycin | 3/5/2019 | $12,034.06 |
| 3 | L.G. | Medicare/ Humana | Pharmacy 1 Prescription Number 240754 | Gentamicin | 1/24/2020 | $8,533.00 |
| 4 | C.P. | Medicare/ Humana | Oxford Premier Pharmacy Prescription Number 70437 | Fluocinolone | 5/11/2020 | $1,890.00 |
| 5 | S.L. | Medicare/ Wellcare | Oxford Premier Pharmacy Prescription Number 70634 | Vancomycin | 6/8/2020 | $1,909.62 |

66.     Additionally, on or about the dates specified below, in the Northern District of Mississippi, and elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **WILLIAMS** submitted or caused to be submitted the following false

24

and fraudulent claims to Medicare for molecular diagnostic testing that was not medically necessary or not eligible for reimbursement, in an attempt to execute and in execution of the scheme, as described in Paragraph 57 of this Indictment, with each execution set forth below forming a separate count:

| Count | Beneficiary | Laboratory 1 Diagnostic Test Claim Number | First Molecular Diagnostic Test Listed in CPT Code | Approx. Date of Claim Submission | Approx. Amount Claimed (Total Billed) |
|-------|-------------|-------------------------------------------|----------------------------------------------------|----------------------------------|---------------------------------------|
| 6 | L.I. | 900220003064440 | Identification of organisms by genetic analysis; 87150 | 1/3/2020 | $2,092.78 |
| 7 | C.B. | 900220032072680 | Identification of organisms by genetic analysis; 87150 | 2/1/2020 | $2,092.78 |
| 8 | L.J. | 900220073135860 | Identification of organisms by genetic analysis; 87150 | 3/13/2020 | $2,092.78 |

Each of the above is a violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 9
### The Conspiracy and Its Objects

67.     Paragraphs 1 through 57 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

68.     Beginning in or around January 2018, and continuing through in or around September 2020, in Lafayette County, in the Northern District of Mississippi, and elsewhere, the defendant,

**CAREY "CRAIG" WILLIAMS, D.P.M.,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Power, Co-conspirator 1, and others known and unknown to the Grand Jury, to:

        a.     defraud the United States by cheating the United States government or any of its agencies out of money and property, and by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS in its administration and oversight of Medicare and its sponsors and Medicare Advantage, in violation of Title 18, United States Code, Section 371; and to commit certain offenses against the United States, that is:

        b.     to solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare and its sponsors and Medicare Advantage, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B); and

        c.     to offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare and its sponsors and Medicare Advantage, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

26

## Purpose of the Conspiracy

69.     It was the purpose of the conspiracy for **WILLIAMS** and his co-conspirators to unlawfully enrich themselves and others known and unknown to the Grand Jury by, among other things: (a) offering, paying, soliciting, and receiving kickbacks and bribes in return for prescriptions for high-adjudication foot bath medications and orders for molecular diagnostic testing; (b) submitting and causing the submission of claims to Medicare for the dispensing of high-adjudication foot bath medications and the conducting of molecular diagnostic testing that were (i) medically unnecessary and (ii) obtained through the payment of kickbacks and bribes and not eligible for Medicare reimbursement; (c) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of the proceeds of the scheme; and (d) diverting proceeds of the scheme for the personal use and benefit of the defendant and his co-conspirators.

## Overt Acts

70.     In furtherance of the conspiracy, and to accomplish its objects and purpose, **WILLIAMS** and his co-conspirators committed and caused to be committed, in Lafayette County, in the Northern District of Mississippi, and elsewhere, the following overt acts:

a.      Power offered to pay, and paid, kickbacks and bribes to **WILLIAMS**, Co-conspirator 1, Podiatrist 1, and others. As to **WILLIAMS**, these payments were made in exchange for prescriptions authorized by **WILLIAMS** for high-adjudication foot bath medications referred to Pharmacy 1 and biological specimens for molecular diagnostic testing referred to Laboratory 1. **WILLIAMS** knew that Pharmacy 1 and Laboratory 1 would bill Medicare and its sponsors for the medically unnecessary high-adjudication foot bath medications and molecular diagnostic tests provided to beneficiaries.

27

b.      In exchange for referrals from **WILLIAMS**, through Power, Pharmacy 1 and Laboratory 1 paid Power a percentage of reimbursements received from Medicare and its sponsors for the dispensing of high-adjudication foot bath medications and the conducting of molecular diagnostic testing. Power in turn paid **WILLIAMS** a portion of the reimbursements that he received from Pharmacy 1 and Laboratory 1.

c.      In or around January 2018, Power entered into an agreement with Laboratory 1 whereby Power would receive twenty-five percent of the reimbursements received by Laboratory 1 after billing insurers, including Medicare, for conducting molecular diagnostic testing referred by Power and ordered by **WILLIAMS**, Co-conspirator 1, Podiatrist 1, and other providers.

d.      In or around January 2019, Power entered into a purported employment agreement with Pharmacy 1 whereby Power would receive thirty percent of the reimbursements received by Pharmacy 1 after billing insurers, including Medicare and its sponsors, for dispensing medications referred by Power, including high-adjudication foot bath medications prescribed by **WILLIAMS**, Co-conspirator 1, Podiatrist 1, and other providers.

e.      Power, Pharmacy 1, Laboratory 1, and others tracked the high-adjudication foot bath medications and diagnostic test orders referred by Power, in addition to the reimbursements received from Medicare, its sponsors, and the various private plans, and the amounts of the kickback and bribe payments.

f.      **WILLIAMS**, Power, Co-conspirator 1, and others communicated by text message, email, telephone, and other forms of communication to inform each other of the amount of reimbursements, the payment of kickbacks and bribes, and other matters related to the scheme.

28

g.     On October 2, 2018, Power sent a text message to **WILLIAMS** and Co-conspirator 1 saying, "Got something for you guys." Later in the conversation, Power texted, "In the parking lot if one of y'all has 2 minutes." **WILLIAMS** responded, "Be right out front or back?"

h.     In October 2018, as remuneration for submitting biological specimens collected from beneficiaries and members to Laboratory 1 for molecular diagnostic testing that was reimbursed by health care benefit programs, including Medicare, Power paid **WILLIAMS** a kickback of approximately $2,800, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare.

i.     On November 30, 2018, **WILLIAMS** sent a text message to Power stating, "Hey, when are we going to see you next?" Power replied, "Monday or Tuesday. What's up?" **WILLIAMS** replied, "Just end of month that's all. No hurries." Power responded, "Oh yeah. I haven't seen the funds yet for the end of the month check. Should be any day now."

j.     In November 2018, as remuneration for submitting biological specimens collected from beneficiaries and members to Laboratory 1 for molecular diagnostic testing that was reimbursed by health care benefit programs, including Medicare, Power paid **WILLIAMS** a kickback of approximately $3,300, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare.

k.     On January 1, 2019, Power texted **WILLIAMS** and Co-conspirator 1, "Payday. Good month. I'll be in town early but going to Clarksdale." **WILLIAMS** replied, "I'll be in Oxford all day tomorrow."

l.     In January 2019, as remuneration for submitting biological specimens collected from beneficiaries and members to Laboratory 1 for molecular diagnostic testing that

was reimbursed by health care benefit programs, including Medicare, Power paid **WILLIAMS** a kickback of approximately $4,000, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare.

        m.      On March 25, 2019, Power texted **WILLIAMS** and Co-conspirator 1, "Good month, guys. Btw, I was about 350 short on that last payment. FYI."

        n.      In March 2019, as remuneration for prescribing beneficiaries and members high-adjudication foot bath medications that were dispensed by Pharmacy 1 and reimbursed by health care benefit programs, including Medicare and its sponsors, and as remuneration for submitting biological specimens collected from beneficiaries and members to Laboratory 1 for molecular diagnostic testing that was reimbursed by health care benefit programs, including Medicare, Power paid **WILLIAMS** a kickback of approximately $4,500, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare and its sponsors.

        o.      On April 18, 2019, Power texted **WILLIAMS** and Co-conspirator 1, stating "550 more. That includes the 350. We were right on the money. Good month guys." **WILLIAMS** replied, "So [Laboratory 1] was only 200?" Power responded, "It came out a little over 5k. I just rounded up to 5200 with the 350 that I owe you. 5550." **WILLIAMS** replied, "Okay last nite you sent 550 that's where I was confused." Power responded, "I owe you 550. I'll be in oxford later on if you're around."

        p.      In April 2019, as remuneration for prescribing beneficiaries and members high-adjudication foot bath medications that were dispensed by Pharmacy 1 and reimbursed by health care benefit programs, including Medicare and its sponsors, and as remuneration for submitting biological specimens collected from beneficiaries and members to Laboratory 1 for

molecular diagnostic testing that was reimbursed by health care benefit programs, including Medicare, Power paid **WILLIAMS** a kickback of approximately $5,500, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare and its sponsors.

        q.      On July 27, 2019, Power texted **WILLIAMS**, stating, "Little lighter month than normal." **WILLIAMS** replied, "What is down biopsy or soaks?" Power responded, "Biopsy. Not terrible. Just lower."

        r.      In July 2019, as remuneration for prescribing beneficiaries and members high-adjudication foot bath medications that were dispensed by Pharmacy 1 and reimbursed by health care benefit programs, including Medicare and its sponsors, and as remuneration for submitting biological specimens collected from beneficiaries and members to Laboratory 1 for molecular diagnostic testing that was reimbursed by health care benefit programs, including Medicare, Power paid **WILLIAMS** a kickback of approximately $3,500, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare and its sponsors.

        s.      In August 2020, **WILLIAMS** spoke over the telephone with Podiatrist 1 regarding his arrangement with Power, stating "[Power] gives you forty percent and he keeps sixty." **WILLIAMS** further stated, "I don't ever put that money in the bank; I just spend the money. That's what I take my family out to eat with, that's what I, you know, just do various things, but I don't ever put it in the bank." Later in the conversation, **WILLIAMS** stated, "Let's face it, it's illegal, and if we got caught, we'd get our hands slapped pretty good probably. I mean I don't think we'd go to jail, but we'd get our hands slapped pretty good." **WILLIAMS** then

stated, "[Power] is always like Doc, don't tell anybody about this, and I'm like, I have as much or more to lose as you do, I'm not going to tell anybody about this."

      t.     On September 4, 2020, Power paid a kickback of $1,000 to **WILLIAMS** by handing **WILLIAMS** cash through a car window in the parking lot behind NMFS.

      u.     From in or around January 2018 through April 2021, Laboratory 1 received approximately $2,196,419 in reimbursements from Medicare for conducting molecular diagnostic testing of beneficiaries and members ordered by **WILLIAMS**.

      v.     From in or around January 2018 through May 2020, Laboratory 1 paid approximately $140,557.76 in kickbacks to Power, through his company, Power Medical, LLC, for the referral of orders for molecular diagnostic testing by **WILLIAMS**, Co-conspirator 1, and others.

      w.     From in or around February 2019 through July 2021, Pharmacy 1 received approximately $816,756.15 in reimbursements from Medicare for dispensing high-adjudication foot bath medications prescribed by **WILLIAMS**.

      x.     From in or around February 2019 through August 2020, Pharmacy 1 paid approximately $121,362.56 in kickbacks to Power, through his company, Power Medical, LLC, for the referral of prescriptions for high-adjudication foot bath medications by Williams, Co-conspirator 1, and others.

      y.     In turn, from in or around January 2018 through in or around September 2020, Power paid approximately $87,950 in cash kickbacks to **WILLIAMS**.

     All in violation of Title 18, United States Code, Section 371.

## COUNTS 10-11

71.     Paragraphs 1 through 57 and 70 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

72.     On or about the dates set forth below, in Lafayette County, in the Northern District of Mississippi, and elsewhere, the defendant,

### CAREY "CRAIG" WILLIAMS, D.P.M.,

aided and abetted by Power and others known and unknown to the Grand Jury, did knowingly and willfully solicit and receive remuneration, that is kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, item, and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare and its sponsors, as set forth below:

| Count | Description | Approximate Date of Payment | Approximate Amount of Payment |
|-------|-------------|-----------------------------|-------------------------------|
| 10 | Cash payment from Power to **WILLIAMS** | 10/2/2018 | $2,800 |
| 11 | Cash payment from Power to **WILLIAMS** | 9/4/2020 | $1,000 |

Each of the above is a violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B).

### FORFEITURE ALLEGATIONS

73.     Upon conviction of any of the offenses set forth above, the defendant, **CAREY "CRAIG" WILLIAMS, D.P.M.,** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, pursuant to Title 18, United States Code, Section 982(a)(7).

74.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

b.      has been placed beyond the jurisdiction of the Court;

c.      has been substantially diminished in value; or

d.      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

A TRUE BILL:

_____
CLAY JOYNER
ACTING UNITED STATES ATTORNEY

/s/ Redacted Signature
FOREPERSON